SPEISER, Receiver, Appellant, vs. MERCHANTS' EXCHANGE BANK and another, Respondents.

SAME, Respondent, vs. SAME, Appellants.

*May 1 — May 21, 1901.*

*Receivers: Compensation: Employment of attorneys: Attorney's fees: Settling accounts: Marshaling of assets and expenses: Payment of expenses: Interest.*

1. The fact that property is in the custody of the law is no justification for violating the principle that, save as costs are taxable by statute, property should not be taken from its owner directly, or indirectly in the form of allowance to a receiver or other trustee, to pay the expenses of his adversary in litigation.

2. The compensation of receivers, trustees, and other like officers of courts should be restrained to reasonable charges, measured, not by the highest salaries which large establishments may pay, but by analogy to such as the law allows to public officers having similar duties.

3. It is one of the duties resting on receivers, trustees, and like officers of courts, that they exercise the same diligence to keep down expenses that they use in protecting or realizing upon the property intrusted to them.

4. Almost the only step taken by the receiver of an insolvent corporation, which was not worthy of criticism, was his prompt and commendable diligence in disposing of the stock of goods coming to his hands for a fair sum, and it appeared, among other things, that he withdrew the money realized on such sale from a respectable bank within a month after making the sale, and secretly loaned it to his personal friends and to the firm of which he was a member; that he immediately retained, and began making large payments to, attorneys who represented one class of contesting claimants for the proceeds of the assets in his hands, including in such payments their services in commencing the suit for sequestration, and suits for attacking the validity of attachment liens for which he was in no way liable; that he took no vouchers for such payments, and made them without any order of court therefor, and without the advice of disinterested counsel; that he resisted all demands upon him to make any report or account; that when personally cited by order of the court, he neglected to include in his account an item of $90, and all interest; and that upon the hearing

Speiser vs. Merchants' Exchange Bank and another.

instead of making full disclosures he placed every obstacle in the way of discovery as to his handling of the money, denied loaning any of it to his firm, and imposed upon those interested in the funds in his hands the labor of discovering facts he had concealed. *Held*, such affirmative misconduct as warrants imposing on him as the penalty entire exclusion from any allowance by way of compensation.

5. While it is possible that the attorneys for one of the antagonistic parties to litigation over assets in the hands of a receiver may be safe advisers for the receiver, the probabilities are all against it. Such practice is a dangerous one and should be discouraged.

6. In such case payments to such attorneys should not be approved, or their advice recognized as justification of the receiver's acts, unless it is made entirely clear that the necessarily and properly prejudicial attitude of such counsel cannot have affected their service to the receiver.

7. A receiver represents all persons interested in the proceeds to be realized by him. His duty is as high to one as to another, and he must not join as a partisan with one or one class against another. If he does so, without express order of the court, his action will not be approved, nor will he be allowed, as against general funds, expenses thereby incurred.

8. Where the financial transactions of a receiver for presentation to the court were of the simplest, and consisted of the receipt, within one month after his appointment, of a gross sum of money, and of a few items of interest thereon, and of some twenty-five items of disbursements, they do not justify the expense of employment of professional assistance in stating the account.

9. Where, after certain creditors had attached the property of an insolvent corporation, and other creditors had begun proceedings to sequestrate the corporate property, a receiver was appointed in such proceedings, and the prosecution of the attachment suits enjoined, and the sequestration proceedings did not result in the production of any new fund, the receiver is not entitled, without the express order of the court, to credit for expenses and attorney's fees in prosecuting the sequestration proceedings.

10. Where the court has adjudged possession and sale by a receiver, rather than by the less elastic methods permitted the sheriff, advisability and benefit are presumed, and the necessary expense of the taking, care, and disposition of the property, at least, must come out of the proceeds.

11. When there are different funds in the hands of a receiver, the court should so marshal them as that general expenses will be paid out

of general funds, and nothing out of those affected by special rights or liens except such as pertain directly to the creation or conservation of such special fund.

12. A receiver, in reliance upon the decisions of the supreme court in the action in which he was appointed, is justified in paying the necessary and reasonable expenses attending the general performance of his duties as an administrative receiver out of funds in his hands, and should be given credit therefor in his accounts.

13. Where the property of an insolvent corporation was claimed by general creditors and also under attachment liens, a receiver appointed in sequestration proceedings is not entitled to credit for a voluntary payment of expenditures and attorney's fees incurred in the litigation between the two classes of creditors, in the absence of any showing that he had thereby created a fund for the benefit of a class, all the members of which ought to contribute to the expenses of creating that in which they are to share.

14. The receiver of a corporation is entitled to credit for expenditures and reasonable attorney's fees in defense of his actual possession of the property confided to him by the court; in taking. arranging, and disposing of such property; in efforts to obtain possession of the books and other assets of the corporation; and in instituting suits on assigned accounts at the express order of the court.

15. In such case the attorney's fees, taxed as costs and collected, must be deducted from the value of attorney's services, as fixed and allowed by the court.

16. Where a receiver of an insolvent corporation delayed rendering his accounts for many years, and, without justification, paid large sums to attorneys for their services and disbursements under a misunderstanding of his duty, and thereafter diverted a large part of the proceeds intrusted to his care to his own use, the court, in the exercise of its discretion, charged him only with simple interest upon the whole balance due from the time he should have rendered his account.

APPEALS from an order of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Affirmed upon the appeal of the receiver; reversed upon that of the creditors.*

Appeal from order settling accounts and awarding expenses and compensation to the receiver in the case of Ballin and others, as plaintiffs, against the J. & E. B. Friend Lace Importing Company and others, as defendants. On

January 16, 1890, the plaintiffs Ballin & Co., judgment creditors, commenced suit by Williams, Friend & Bright, and Finches, Lynde & Miller, as their attorneys, to close up the defendant corporation, and sequestrate its property, under sec. 3216, R. S. 1878. At that time the *Merchants' Exchange Bank* and the *Kalamazoo Knitting Company* had attached all the stock in trade of the insolvent corporation, and the sheriff was in possession. Certain other creditors had filed subsequent attachments on the same property. In addition, all of the accounts receivable of the insolvent corporation had been assigned to a class of creditors represented by Messrs. Quarles, Spence & Quarles. Upon the filing of the complaint, the court entered an order sequestrating the property and enjoining all parties from prosecuting other suits against the corporation, and appointed *Morris Speiser* receiver, in pursuance of the statute, and ordered him to take into his possession all of the property of said corporation, and dispose of the same, and ordered that the sheriff turn over to him the stock of goods then held under attachment. Thereupon appeals were taken by the two classes of attaching creditors, especially from that part of the order commanding the sheriff to relinquish possession to the receiver and the part enjoining other proceedings. On that appeal the plaintiffs Ballin & Co. were named as respondents, and upon their attorneys the notice of appeal was served, and in this court the brief in opposition to the appeal was signed by their attorneys, describing themselves as attorneys for the respondents. The order was affirmed on appeal. *Ballin v. Loeb*, 78 Wis. 404. Meanwhile, the property having been turned over in accordance with the order of the circuit court, it was at once disposed of by the receiver for $7,225. On January 15, 1894, after extended trial in circuit court after the filing of the *remittitur* on the former appeal, an order was entered denying the claims of any of the defendants to preference by reason of their attachments, and ad-

judging that all proceeds of property in the hands of the receiver be divided among all creditors who should prove their claims ratably. That order also directed the receiver to bring suits against the respective assignees of accounts receivable, holding that the main action could not be maintained against them for that relief. Thereupon the attaching creditors again appealed, and their appeal was defended in this court by O. T. Williams and Miller, Noyes & Miller, under the designation of attorneys for plaintiffs and respondents. The decision of the trial court was reversed as to the rights of the attaching creditors to preference. Opinion filed February 5, 1895 (*Ballin v. Merchants' Exch. Bank*, 89 Wis. 278). This decision was considered by the receiver's attorneys conclusive against his right of recovery in the suits against the assignees of the various accounts, and those actions were discontinued in April, 1896. Commencing about September, 1896, the attorneys of the *Exchange Bank* persistently demanded that the receiver file his account and distribute the money in his hands, which he failed to do until an order to show cause was served upon him returnable October 11, 1897, whereupon he presented an account, and amended the same the following day. That account showed total receipts of $7,504.10, and claimed credits to the amount of $7,523.95, to which was afterwards added $250 additional attorney's fees claimed (of these credits, $2,500 was claimed as compensation by the receiver, and over $3,500 for attorney's fees); thus more than exhausting the entire estate. The account was objected to, and referred to Commissioner Hugh Ryan for examination and report. He reported receipts of money, including interest, actually collected by the receiver, to the amount of $8,151, consisting wholly of the proceeds of the attached property. He allowed credit to the receiver for $600, confined to services in the disposal of the property turned over to him. He allowed disbursements for counsel fees for general retainer

and general advice in and about the receivership $600, and for services in the suits upon the assigned accounts, $200, and for services in connection with the final accounting $150. He also allowed as credits money disbursements amounting to $1,409.35, all relating to the acquisition, care, and disposal of the stock of merchandise, except an item of publishing notice to creditors, and the costs paid on discontinuance of the suits against the assignees of accounts. The court modified this by allowing in addition $800 of attorney's fees in the course of the litigation in the present action, and an unitemized allowance of $142.43 for various disbursements made by the attorneys; also for disbursements for the costs, printing, and so forth, upon the second appeal, above mentioned. He also added $150 as compensation to the receiver for his services in connection with the various stages of the litigation. The court thus found a balance due from the receiver of $3,808.58, to which he added interest at six per cent. from December 1, 1897, and ordered that the receiver forthwith pay the total to the clerk of the court. From that order both the receiver, *Morris Speiser*, and the attaching creditors, *Merchants' Exchange Bank* and *Kalamazoo Knitting Company*, appeal.

For the receiver there were separate briefs by *Moritz Wittig*, attorney, and *Edwin S. Mack*, of counsel, and oral argument by *Mr. Mack*. They contended, *inter alia*, that the receiver was justified in paying his counsel without an express order for that particular purpose. High, Receivers, §§ 217, 798; Beach, Receivers, §§ 263, 751; *Haydock C. Co. v. Pier*, 78 Wis. 579, 582; *Fuller v. Abbe*, 105 Wis. 235; *Farwell v. W. U. Tel. Co.* 161 Ill. 613; 20 Am. & Eng. Ency. of Law, 191; *Shainwald v. Lewis*, 8 Fed. Rep. 878.

For the *Merchants' Exchange Bank* and *Kalamazoo Knitting Company* there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *J. G. Flanders*.

Speiser vs. Merchants' Exchange Bank and another.

DODGE, J.    The present case is so impressive an illustration that we cannot ignore the duty to make it the text for some general remarks upon a tendency at the bar, and even with courts, which promises to develop into a most serious abuse, if it has not already done so.   That tendency is to look upon funds *in gremio legis* as not sheltered by the same rights of ownership, and not entitled to the same protection from extortionate and unreasonable charges, as if they had remained under the control and custody of their owners. Some of the demands made against such funds could be justified only upon the view that they are already divested from all private ownership — that any part thereof which ultimately reaches those to whom they really belong does so only by grace, or by way of free gift; so that any deductions therefrom, however illogical in character or excessive in amount, cannot be subject for complaint by any one. This court, in some recent decisions, has attempted to check this tendency in certain of its phases.   *In re Donges's Estate*, 103 Wis. 497; *Patton v. Ludington*, 103 Wis. 629, 651. While the statutory restrictions there enforced are, perhaps, not universally applicable, one of the principles announced should be constantly in mind, namely, that property should not be taken from its owner to pay the expenses of his adversary in litigation, directly or indirectly.   The fact that such property is in the custody of the court is no justification.    The tendency of which we speak has not gone unnoticed elsewhere.   It has been characterized by MILLER, J., as "the grossest judicial abuse of the modern day."   *Trustees v. Greenough*, 105 U. S. 527, 538.   It has led the New York court of appeals to admonish a trial court that it "does not sit as a bandit dividing booty."   *Att'y Gen. v. North American L. Ins. Co.* 91 N. Y. 57.   Valuable suggestions as to some of the limits upon receivership expenses are set forth in *Henry v. Henry*, 103 Ala. 582.   As in cases of this character, the creditors or others interested in the

fund, and on whom really falls the burden of improper or excessive allowances, are often numerous, their individual interests small, and their presence in the litigation only by representation, it is all the more a duty of courts to vigilantly protect them against the cupidity of those who are placed in control over the property, and to restrain court officers to reasonable compensation for the services which they render. We have pointed out in *Richardson v. Tyson, post,* p. 572, that guardians *ad litem* are public officers, and should be compensated in analogy to official emoluments. The same is true, though perhaps in less degree, of receivers, trustees, and other like officers of courts. They should be restrained to reasonable charges, measured not by the highest salaries which large establishments may pay, but by analogy to compensation which the law allows to public officers having similar duties. For the settling of an estate of the size of this, an administrator would be entitled to about $200. While the analogy is perhaps not very close, yet it is suggestive when the receiver demands $2,500 for his administration. One of the duties resting upon such officers is that of the same diligence to keep down expenses that they owe in protecting or realizing upon the property. Industry and skill in the latter respect will be of little benefit if the fruits thereof may be dissipated by reckless extravagance of expense, whether for counsel fees or otherwise.

We have indulged thus much in generalization upon a very important subject because of the impossibility of prescribing fixed rules of law. Hardly any form of charge or disbursement which a receiver can imagine is without some authority to support it. Indeed, it is hard to say that any may not, under some circumstances, be permissible. Only in the wise discretion and firmness of the courts can there be found prevention or remedy for the abuse and disgrace of judicial conservation of estates from their enemies, only to permit their destruction by the very salvers. If such abuses con-

Speiser vs. Merchants' Exchange Bank and another.

tinue, the beneficent power of a court of equity to take to its sheltering arms a litigated estate while rights to it are being established will become a mockery, worse than the avoided perils as it is more effective.

The record before us presents one of the most extreme cases of affirmative misconduct on the part of a receiver within the history of the court. Indeed, almost the only step taken by him which is not worthy of criticism is his disposal of the stock of goods coming to his hands. That stock he received about January 30, 1890, inventorying at cost about $14,000, and at the sheriff's appraisal about $8,800. Within one month, to wit, on February 26th, he did, with commendable diligence, make a lump sale of the entire stock, under the order of the court, for $7,225, and received the money therefor. The following month he sold the only remaining asset in his hands — the safe — for $90. A month later he withdrew substantially all this money, except disbursements he had already made, from a respectable bank, in which a record of his cash transactions would have necessarily appeared. The money then drawn — $6,000, on April 12, 1890 — has never again appeared in any bank. It now transpires that he made loans of the money thus in his hands to various acquaintances upon interest, probably only a part of which have yet fully been discovered. He immediately retained, and commenced making large payments to, the attorneys who represented one class of contesting claimants for the proceeds of the assets in his hands, including in such payments their services in commencing the suit for sequestration and attacking the validity of the liens acquired by the appellants, *Merchants' Exchange Bank* and *Kalamazoo Knitting Company*, for which he was in no way liable. He took no vouchers for such payments, and it is now impossible, from the evidence at least, to discover the purpose of several of the attorneys' disbursements for which he paid them. He continued payments to the plaintiffs' at-

torneys without order of court, and without advice from
disinterested counsel, indiscriminately, for services helpful
to him in the performance of his duties as receiver and those
rendered exclusively in the interest of the plaintiffs in their
contention with the attaching creditors.   He resisted all
demands upon him to make any report or account, and,
when finally cited by order of court, he presented an ac-
count which failed to give any credit for the sale price of
the safe or for any interest.   This he followed on the fol-
lowing day by an account correcting the omission as to the
safe, and charging himself with interest received from Lan-
dauer & Co., $18.95, and from Friend Bros. Clothing Com-
pany, $170.15, and declaring unambiguously that he had
received no other interest.   That account claimed credits to
more than exhaust the total assets coming to his hands, con-
sisting of $2,500 for his own services and of attorneys' fees
aggregating some $3,553.93.   He presented to the court no
books of account, not even canceled checks or stubs of
checks, and for several very doubtful disbursements he had
no vouchers.   Upon the hearing he placed every obstacle
in the way of discovery as to his handling of the money;
denied absolutely that he ever loaned any of it to his own
firm, Speiser, Bing & Co., or received any interest from
them; told an utterly confused story with reference to vari-
ous efforts to find safe places to put the money, and to the
carrying of it about in his pocket, sometimes in currency,
sometimes in bank drafts, and sometimes in certificates of
deposit.   Afterwards, when confronted with the books of
several firms to whom he had loaned moneys, including
those of Speiser, Bing & Co., he lapsed into that form of
falsification, "I can't remember," which has been classic
certainly since the trial of Queen Caroline, and that, too,
with reference to subjects where other testimony showed
forgetfulness impossible consistently with truth of the other
assertions, and where forgetfulness was itself a breach of

Speiser vs. Merchants' Exchange Bank and another.

his duty to furnish information. He was at last driven to confess that in October, 1895, when his own firm failed, the balance of the moneys then in his hands — sometimes spoken of as about $2,500, and sometimes as $2,900 — he took to himself in the guise of compensation, and expended it in making settlement with his creditors. The appellant creditors were thus driven to extraordinary research in all places where he was likely to have loaned this money. They thus brought to light the facts that during a large share of the time between the withdrawal of the money from the bank, April 12, 1890, to December 3, 1894, when it was paid back to him by Friend Bros. Clothing Company, he had kept these moneys invested, first with one Landauer, who had paid him $193.23 as interest; then from August 5, 1892, until November 29, 1893, with his own firm of Speiser, Bing & Co., from whom he took a note drawing seven per cent., on which there had been paid into his private account, not as receiver, $473 of interest; that he then commenced to withdraw from Speiser, Bing & Co., and loan to the Friend Company, who repaid him the money, together with $170.39 of interest, on December 3, 1894. The data thus obtained also make it reasonably certain that a sum approximating $2,000 was only gradually drawn from Speiser, Bing & Co., so that an average period for its retention by them would be about six months. No evidence was adduced as to what he did with the $6,000 for about a year after it was withdrawn from the bank in April, 1890. In all this investigation he persistently obstructed and imposed on the creditors great labors, which proper account books would have rendered unnecessary, and which, if it became necessary, he ought to have performed.

In the light of such a record it is unnecessary to consider the niceties of the rules governing conduct by receivers. Secret loaning of money, resistance of all demands for accounting, suppression of facts with reference to his handling

of the money, grossly improper expenditures, and the imposition upon those interested in the fund of the labor of discovering facts which the receiver had concealed instead of fully disclosing, convict him of such breaches of the most important and highest duties of a receiver that both the referee and the court should, without hesitation, have imposed, as the least penalty, entire exclusion from any allowance by way of compensation. *Clapp v. Clapp*, 49 Hun, 195, 201; *Henderson v. Sherman*, 47 Mich. 267.

An earnest plea was made by the counsel, not exactly for the receiver's innocence, but for his ignorance, contending that he had relied at all times upon the advice of his attorneys. We cannot listen to this plea. He had selected as attorneys men who were interested in one side of the litigation, and who could not advise him impartially. This fact must have been obvious to the simplest mind. Again, it is impossible that he was oblivious of the fact that he was a creature and mere implement of the court, and that to that court he could always go for instruction and advice. While it may in some cases, or on some subjects, be possible that the attorney for one of the antagonistic parties may be a safe adviser for the receiver, the probabilities are all against it. The practice of employing such counsel is a dangerous one, and should be discouraged. Ordinarily, attorneys already retained for the plaintiff are, by reason thereof, committed to a partisan purpose, and to the interest of their client, their duty to whom must usually exclude the impartial point of view which the receiver should maintain. Only when it is made entirely clear that the necessarily and properly prejudicial attitude of such counsel cannot have affected their service to the receiver should any payments to them be approved, or their advice be recognized as any justification of the receiver's acts. High, Receivers, §§ 216, 806; *Adams v. Woods*, 8 Cal. 306, 318; *Heffron v. Flower*, 35 Ill. App. 200; *Farwell v. Great Western Tel. Co.* 161 Ill. 522, 613.

Even if ignorance of his duty might be an excuse to this receiver, we cannot, after reading his testimony, believe in such ignorance. Men who, without intentional turpitude, have erred, when called to account do not indulge in the intricacy and adroitness of concealment and falsification and refusal to remember, which pervade the many pages of this receiver's testimony. It calls for the highest condemnation of courts, and wholly excludes the propriety of allowing him any compensation for his own services.

In addition to the disallowance of compensation for his own services, the conduct of the receiver with reference to his final account is such that it would be an abuse of discretion to allow him any expenses incurred in the statement or settlement thereof. Conceding the propriety, in a proper case, of the estate bearing the expenses of passing the account of a court officer (see *Richardson v. Tyson, post*, p. 572), none of the circumstances are here present to warrant it. The financial transactions calling for presentation to the court were of the simplest. The receipt, within a month after his appointment, of a gross sum of money, the further charge of a few items of interest received upon that money, and against this some twenty-five items of disbursements, did not justify the employment of any professional assistance in stating that account. A schoolboy of fair intelligence could have kept the account and stated it. Much more should that have been possible to an experienced business man of the financial adroitness of this receiver. Every step with reference to the account in which is involved difficulty or labor has been due to his own misconduct, and he must not be permitted to impose upon this estate further depletion by reason thereof, especially when his conduct has imposed on the opposite party such burden of unnecessary labor and expense to discover facts which should have been clearly disclosed by the account itself.

In passing upon the propriety of allowing the various dis-

bursements claimed to have been made by the receiver, a classification must be made, and there must be considered the rules of law applicable to each class. The proceedings and consequent expenses present three different aspects: First, there is the contention of the plaintiffs, as general creditors, against said appellant lienholders, as to the validity of such liens, and as to which should receive the proceeds of the property; second, there were the proceedings of the receiver in obedience to the general commands of the court to take, care for, and transpose into money this particular property for the benefit of whoever might have rights in it; and, third, the proceedings of the receiver in the effort to find and bring other assets under the control of the court for the benefit of the general creditors.

As to the first class of expenses, while there may be some confusion of decision in its application, the controlling general rule is not doubtful. The receiver represents all persons interested in the proceeds to be realized by him. His duty is as high to one as to another, and he must not join as a partisan with one or one class against another. If he does so,— certainly if without express order of the court,— his action will not be approved, nor he be allowed, as against the general funds, expenses thereby incurred. *T. T. Haydock C. Co. v. Pier*, 78 Wis. 579, 582; *In re Donges's Estate*, 103 Wis. 497. True, there are many cases in which a receiver has been allowed for disbursements in contests between different classes of claimants to assets, but in substantially all of them it will be found either that a new fund has been created, or an existing one saved from depletion, or sought to be, which fund belonged to the class in aid of which the receiver acted; so that the allowance was in fact paid out of the fruits of the receiver's acts. *Fuller v. Abbe*, 105 Wis. 235; *T. T. Haydock C. Co. v. Pier, supra;* Beach, Receivers, § 753; High, Receivers, § 806; *Att'y Gen. v. North American L. Ins. Co.* 91 N. Y. 57;

*Strong v. Taylor,* 82 Ala. 213; *Petersburg S. & I. Co. v. Dellatorre,* 70 Fed. Rep. 643; *Burden Central S. R. Co. v. Ferris S. M. Co.* 87 Fed. Rep. 810. In no case, save as costs are taxable by statute, should a fund belonging to one litigant be depleted to pay the expenses of his antagonist, either directly or indirectly in the form of allowance to a receiver or other trustee.

As to the proceedings within the second class there can be no serious doubt. The propriety of the court, in exercise of its equitable powers, taking into its own hands the disposal of this merchandise, is *res judicata* in this case, under the decisions of this court at 78 Wis. 404, and 89 Wis. 278. The validity of such action does not depend on the result. The court having adjudged advisable possession and sale by a receiver, rather than by the less elastic methods permitted to the sheriff, advisability and benefit are presumed. In this case the probabilities are pretty strong that such step was advisable, and that the receiver's management produced a price largely in excess of any obtainable at sheriff's public sale. Whether that be so or not is, however, immaterial. The necessary expenses of the taking, care, and disposition of that merchandise, at least, must come out of its proceeds. Secs. 3217, 3245, Stats. 1898; *T. T. Haydock C. Co. v. Pier,* 78 Wis. 579, 582; *Kneeland v. Am. L. & T. Co.* 136 U. S. 89, 98.

In dealing with the third class of expenses the court should, when there are different funds, so marshal them as that general expenses will be paid out of general funds, and nothing out of those affected by special rights or liens, except such as pertain directly to the creation or conservation of such special fund. Here, however, there is no general fund, and the only one in the hands of the receiver is claimed to be burdened with liens to more than its amount. The merchandise from which it was realized, however, was the property of the insolvent corporation. It passed to the re-

ceiver, to be treated and administered by him as such in all respects, and not subject to any lien. An examination of the two prior decisions by this court permits no other view, and those decisions, whether right or wrong, constitute the law of this case. The lien of the attaching creditors might have been preserved expressly, but it was expressly divested, leaving to the attaching creditors merely the right to come into this action, and share in the funds realized by the receiver according to their equitable rights, as they might ultimately establish them. This court said (78 Wis. 412):

"All the property is sequestered, including that in the officer's hands under attachment or execution. Any less than all the property of the insolvent corporation would be ineffectual to make an equal, just, and fair distribution among all the creditors in proportion to their claims. It is all sequestered, and all of it must go into the hands of the receiver, to be disposed of by him alone as an officer of the court; and all persons having any of the property must be ordered to deliver it to him."

This language bears no other construction than that the receiver had both the right and duty to treat all such property as general assets, and need make no distinction between one class and another pending his administration. He was not to be concerned with what the court might do ultimately with the funds resulting from that administration. We think that it would overrule the fair construction of these previous decisions to hold now that it was at all times the duty of the receiver to keep this particular fund distinct and sacred; that he must omit all his ordinary duties as receiver necessitating expense,— even those enjoined upon him by express order of the court,— unless other means were provided for meeting such expense. We hold, therefore, that in reliance on those decisions the receiver was justified in paying the necessary and reasonable expenses attending the general performance of his duties as an administrative receiver out of the funds in his hands, and should be given credit therefor. Secs. 3217, 3245, Stats. 1898.

The foregoing rules, applied to the disbursements presented for credit by the receiver, must exclude all those relating to the commencement and prosecution of the main action for the sequestration of property, appointment of the receiver, and enjoining of independent actions. These steps were all taken by the plaintiffs, and not by the receiver. He had not pledged his personal responsibility therefor, and could only have credit for volunteering payment thereof if it appeared at the close of the litigation that such amounts should be allowed plaintiffs on the ground that they had created a fund for the benefit of a class, all members of which ought to contribute to the expenses of creating that in which they are to share. See authorities cited. If, as here, plaintiffs' efforts are not productive of any such fund, no allowance could properly be made them; and the receiver's voluntary payment, as it could not have been authorized in advance, cannot now be confirmed.

Equally excluded are any expenses incurred in the litigation in circuit court and on the second appeal to this court over the rights of various classes of creditors in the funds realized and ready for distribution. There the plaintiffs, representing the general creditors, were seeking for their own benefit to resist the claim of the attaching creditors. As to that controversy the receiver was a stakeholder merely, and went outside of his duty in attempting to champion or promote either side of the controversy.

Within the second and third classes of expenditure fall, first, so much of the expenses of the first appeal as pertain to the defense of the receiver's actual possession of the property confided to him by the court. Protection of the trust fund and of his control over it is one of the primary duties of a trustee. This would be obvious if his possession were attacked by replevin, but no distinction, in reason, can be suggested when some other procedure is followed, equally effective to take from a trustee that which the court has im-

posed on him the duty to retain. *In re Luscombe's Will*, 109
Wis. 186. Here fall also the expenses of taking, arranging,
and disposing of the merchandise placed in his care, and the
efforts to obtain possession of the books and other assets of
the insolvent corporation, including the institution of suits
on the assigned accounts at the express order of the court.

From these views results that there should be allowed as
credits the disbursements, other than attorneys' fees, speci-
fied by the referee's eleventh finding, aggregating $1,409.35,
and, in addition, the following expenses paid by
attorneys:

| | |
|---|---:|
| Fees of Commissioner Ryan on examination of Friend | $15 25 |
| Sheriff's fees on subpœna for same | 2 31 |
| Attorney's expenses to Madison, first appeal | 11 25 |
| Fees of Commissioner McElroy on examination of Bick | 12 62 |
| Fees of sheriff on subpœna for same | 2 31 |
| Serving summons in suits on assigned accounts | 2 00 |
| Fees of clerk of court in same suits | 12 00 |
| | $1,467 09 |

Any other proper disbursements which may have been
paid by plaintiff's attorneys are not established with suffi-
cient certainty to justify allowance. The value of the gen-
eral services of the attorneys in the course of the assign-
ment is fixed by both Williams and Miller at $450, and no
evidence justified the referee's finding of a larger amount.
That sum, therefore, should be allowed as covering all serv-
ices, except as further specified. The value of attorneys'
services in the first appeal, so far as they related to the sub-
ject of the receiver's custody of the merchandise, are not
separated, but, as they were rendered in this court, we can
judge of them, and fix the value at $400, from which must
be deducted the $25 taxed attorneys' fees collected by Mr.
Williams. With some hesitation we affirm the referee's
finding of $200 as the value of attorneys' services in com-
mencing four suits on the assigned accounts and in conduct-

ing the same to their ultimate discontinuance. We thus find proper total credits for attorneys' fees of $1,025, and for other disbursements of $1,467.09. Thus the balance in the receiver's hands, of moneys actually received by him, $8,151.87, after deducting all permissible credits, is the sum of $5,659.78. This has been in his hands at least since October, 1895, when he appropriated the last of it to his private use. At that time the litigation was practically at an end, the right of the attaching creditors to priority in payment had been established by this court, and the futility of further procedure against the assignees of accounts was as obvious as at any time, though actual dismissal did not occur till April, 1896. No reason is apparent why the receiver should not have accounted as early as the time when he misappropriated the balance of some $2,500 to his own use. When the moneys of the trust are actually diverted to the trustee's own use, he should ordinarily be charged compound interest thereon. In this case, however, considerably more than half of the balance for which he must respond was not so converted, but had been unjustifiably paid to others by misunderstanding of his duty. It may also be noted that not until later was committed the grossest of the misconduct which has constrained us to disallow all compensation to the receiver. In the exercise of the discretion permitted courts, we shall not impose compound interest, but shall hold the receiver to account for simple interest upon the whole balance from November 1, 1895.

It hardly needs statement that upon the receiver's appeal we find no assignment of error which can be sustained. No claim of his was denied which ought to have been allowed.

*By the Court.*— Upon the appeal of *Morris Speiser*, the order of the superior court is affirmed. Upon the appeal of *Merchants' Exchange Bank* and *Kalamazoo Knitting Company*, that order is reversed, and the cause remanded with

---

directions to enter an order requiring the receiver to pay to the clerk of that court the sum of $5,659.78, with interest from November 1, 1895, and for further proceedings according to law.