STATE CENTRAL SAVINGS BANK OF KEOKUK v. FANNING BALL-
BEARING CHAIN COMPANY, Defendant; WILLIAM ANDRUS,
C. F. McFARLAND, JOHN C. FISHER, EDWARD S. ORR,
J. W. HUISKAMP AND C. E. FANNING, Intervenors, and
G. W. FANNING, Receiver, Appellants.

Receivers: AUTHORITY OF. The authority of a receiver respecting
1  the property given into his charge is measured by the order of
his appointment, or such power as may be reasonably inferred
therefrom, and the subsequent directions of the court.

Acts of a Receiver: HOW TESTED. His duty is to preserve the
2  property, and in testing his acts the court will inquire, first,
were they within the power conferred by the order; second, if
so, did he act with ordinary prudence and sagacity; third, if
he acted without authority, was it beneficial for the estate.

Same: UNAUTHORIZED SALE AND EXPENDITURE OF PROCEEDS. Where
3  a receiver is authorized to sell property and hold the proceeds
"for further orders of court," or where he sells without an
order and he uses the proceeds in an unauthorized manner, he
must be charged with the fair value of the property sold.

Same: UNAUTHORIZED EXPENDITURE: EVIDENCE. Where a receiver
4  is authorized to borrow and expend a certain sum for the pur-
pose of completing unfinished work, he has no power to under-
take new and different work and expend a larger sum than that
specified, and he should only be allowed for the expenditure
of the authorized amount.

Same: EVIDENCE: MISMANAGEMENT: INSUFFICIENT EXCUSES. Evi-
5  dence considered and held wholly insufficient to justify the
receiver in operating a manufacturing plant at a loss where
there is no express authority to do so.    This mismanagement
cannot be excused on the ground that he could not discharge
help because of lack of funds to pay them off; or that the
plant was operated by him at less sacrifice than prior to his
appointment; or that he was negotiating a sale of certain pat-
ents; or that he consulted with the judges; or that the lease
of the premises had a long period to run; or that some of the
parties interested knew what he was doing.

Same: EXERCISE OF DISCRETION. APPROVAL OF ACTS. Receivers
6  may exercise their sound discretion in many matters relating

to the management and care of the property in their custody without a specific order of court, but the subsequent approval of such acts will be determined by the good faith of the receiver and his exercise of reasonable prudence in the care of the property.

**Payment of Claims Without Order:** DISALLOWANCE OF SAME. In the absence of an order directing the distribution of assets a receiver has no right to prefer and pay his own claim, and when done, the same should be disallowed.

**Evidence of Mismanagement:** ADJUSTMENT OF ACCOUNTS. Where a receiver fails to report his doings, except upon citation, and without authority knowingly continues to operate the business at a loss, his accounts should be adjusted by making allowances according to the benefits received by the estate. Evidence of mismanagement considered.

**Attorney's Fees.** In the settlement of his accounts, where the receiver is guilty of mismanagement, he is not entitled to attorney fees out of the property of the estate.

*Appeal from Keokuk Superior Court.*—HON. F. T. HUGHES, Judge.

WEDNESDAY, DECEMBER 17, 1902.

THE Fanning Ball-Bearing Chain Company had been organized for the purpose of manufacturing bicycle chains so constructed that the links were fastened together by balls or cylinders, revolving as they passed over the sprocket wheel, thereby lessening the friction, and had executed two promissory notes to plaintiff. These were not paid when due, and suit thereon was begun October 3, 1896, aided by a writ of attachment, which was levied on all the company's property. October 5, 1896, C. E. Fanning filed a petition of intervention, alleging that he was the inventor of the chain, and owned one-half of the company's stock, or seventy-five shares; that the company had the prospect of selling its patents for more than its indebtedness; that it was doing a valuable business, and receiving orders for chains, which would be lost if the property

remained in the hands of the sheriff, and its machinery, if allowed to remain idle, would deteriorate in value. He prayed that a receiver be appointed to take possession of the property, and continue the business of manufacturing and selling chains, to the end that the property of the company and the good will in its business might be preserved. Orr, Fisher, and McFarland, owners of forty-nine shares of stock, also intervened, with the request that a receiver be appointed "for the purpose of making an advantageous disposal of the property." G. W. Fanning presented his affidavit, from which it appeared that he was a director of the corporation, and the owner of one share of stock, and, for himself and other owners of twenty-five shares, requested the appointment of O. E. Fanning as receiver; suggesting his peculiar fitness because of having had entire charge of the plant. October 8, 1896, the court appointed G. W. Fanning receiver, with directions to take possession of the property and hold the same subject to the order of court. The receiver qualified, and October 15, 1896, filed an inventory, showing property of the corporation in his hands of the cost price of $4,820.77. He also stated that the electric motor had been taken by replevin from him, and that the rent of the building in which the property was housed fell due on that day; "that orders for chains are coming in, and the machinery idle; and that it is necessary to be permitted to obtain funds for the purpose of carrying on the business, and protecting the machinery, property, business, and good will" of the company,—and, to that end, prayed for authority to borrow $300. November 10, 1896, the court, with the consent of all parties, authorized the receiver to borrow this money "to pay out and procure power to run the machinery to finish and put on the market the manufactured product of the defendant company."

Previous to this, on October 21, 1896, Wm. Andrus had filed his petition, asking that the priority of his lien for

rent be established; and C. F. McFarland had asked that a labor lien for $100 be allowed.  On the 10th of November the plaintiff obtained judgment for $1,023.11, with interest and costs, together with an appropriate order with respect to the property attached.  November 12th the receiver was given authority to employ counsel; December 11th, to sell a milling machine for $100, and hold proceeds subject to the future order of the court; July 3, 1897, to sell three other machines for $750, and hold proceeds, after paying cost of sale and shipment, as above.  September 21, 1897, J. W. Huiscamp intervened, claiming that, as assignee of C. E. Fanning, he was entitled to the latter's labor claim of $100.  Upon citation the receiver filed a detailed report, January 24, 1898, to the effect that he had received $2,307.63, and paid all out for expenses, save $8.04; that he still had property on hand of the value of $1,950.92, and bills receivable, good, $99.57, and, not good $137.21; that there were unpaid claims of $243.59 and receiver's unpaid salary of $1,075.  A supplemental report was filed November 11, 1899, from which it appeared that he had received since the last report $180.61, and paid out $191.79.  All parties filed exceptions to these reports, and after full hearing the superior court, on the 3d of July, 1901, ordered the receiver to pay into the hands of the clerk of court the sum of $1,000, with interest at the rate of six per cent. per annum from January 24, 1898, and $30 to be paid for services rendered by Jos. H. Anderson as attorney for the receiver; that the receiver's account, except in so far as involved in such order, stand approved, and that no compensation other than as therein involved be allowed; that certain suits and preferred claims be paid from the above amount, and the balance be applied on plaintiff's judgment; that the receiver deliver the property remaining in his hands to the city marshal, to be sold under special execution issued on plaintiff's judgment.

To all of which the receiver and plaintiff excepted, and both appeal; the appeal of the receiver being first perfected.—*Affirmed.*

*J. H. Anderson, D. F. Miller* and *H. Scott Howell & Son* for appellant Fanning, receiver.

*James C. Davis* and *Hollingsworth & Blood* for appellant State Central Savings Bank of Keokuk.

*Hollingsworth & Blood* for appellees Andrus, McFarland, Orr and Fisher.

*J. F. Smith* for appellee Huiscamp.

LADD, C. J.—The proposal of the Fannings that a receiver be appointed for the purpose of continuing business met with opposition from the other stockholders of the company, who alleged that the plant had been operated at a loss, and demanded the appointment of a disinterested person to effect a sale of the property. The court, in selecting G. W. Fanning, evidently adopted the view of the objectors; for, in doing so, C. E. Fanning, the only person, as the evidence shows, competent to manufacture the bicycle chains, was rejected, and the appointee merely directed to take "charge of all the property of any kind, the books, papers, patent rights of the corporation, and hold the same subject to the direction of this court." The extent of a receiver's authority is always to be measured by the order of appointment, and such subsequent directions as may from time to time be given. He must stand indifferent as between the parties, though appointed on the application of one of them, and prudently preserve and protect the property intrusted to him as an officer of the court. The property is in *custodia legis,* and the receiver acts for the court, as its creature or officer, having no powers save those conferred upon him by its orders, or reasonably to be implied there-

1. RECEIVERS: authority of.

from. *Bank of Montreal v. Chicayo C. & W. R. Co.*, 48 Iowa, 518; *Booth v. Clark*, 17 How. 322 (15 L. Ed. 164); *Davis v. Gray*, 16 Wall. 203 (21 L. Ed. 447); *Attorney General v. Insurance Co.* 89 N. Y. 94; Bishop, Equity (3d Ed.) par. 580.

Indeed, the receiver has been aptly termed the arm or hand of the court, by which it seizes property in controversy, and preserves it for the benefit of whomsoever shall ultimately become entitled thereto. 20 Am. & Eng. Enc. Law (1st Ed.) 158. The primary object is the preservation of the property, and every person undertaking the duties of a receivership must be assumed to appreciate the main and controlling purpose to be subserved in his selection. It is no injustice to him, then, that the object of his appointment be kept in mind in adjusting his accounts, and that courts, after seizing the property of litigants, will not approve of its dissipation in useless expenses, or shut their eyes to its loss through the negligence or mismanagement of its officers. Not every act within the letter of an order can be sanctioned, nor everything done without the direction of the court condemned. The tests to be applied are: (1) Was the act under investigation within the authority conferred by an order of court? (2) If so, was it performed with reference to the preservation of the estate, as a man of ordinary sagacity and prudence would have performed it under like circumstances? (3) If without authority, was it beneficial to the estate? These principles are so elementary that authorities need scarcely be cited. But see *Yetzer v. Applegate*, 85 Iowa, 121; *Kaiser v. Kellar*, 21 Iowa, 95; Beach, Receivers section 229, 301; 20 Am. & Eng. Enc. Law (1st Ed.) 120; *Carr's Adm'r. v. Morris*, (Va.) 6 S. E. Rep. 613.

2. Acts of a receiver: how tested.

The property, though temporarily in the keeping of the court, is sheltered by the same rights of ownership as before seized. It "does not sit as a bandit dividing booty," as was remarked by the court of appeals of New York in

*Attorney General v. Insurance Co.*, 91 N. Y. 57 (43 Am.. Rep. 648). Its duty is to see that the property is conserved; with the same care as is exacted from trustees generally. The same degree of diligence should be exacted from the receiver in keeping down expenses and shielding the property from unjust exactions as a prudent man would. exert in protecting and realizing from his own property. Any other rule would be inconsistent with the high responsibility involved in devesting owners of possession for the purpose of a safer administration and more just distribution by the court. See *Speiser v. Bank.* (Wis.) 86 N. W. Rep. 243; *Henry v. Henry*, (Ala.) 15 South. Rep. 916.

II.    With those general rules in'view, let us turn to the report of this receiver. Upon his own application, he was directed to sell a milling machine for $100, and three screw machines for $750. As to the first, issue was joined as to whether the lien for rent, or of the wages of employes, within thirty days previous to his appointment, should have priority, and he was ordered to hold the proceeds of both sales subject to existing liens and "the further orders of the court." In utter disregard of these specific instructions, he paid out the entire amount for expenses in operating the plant. In passing on his conduct and in adjusting his accounts, this fund must be treated as though held as directed. Without an order, he sold a press, a chain tester, and a drilling machine for $270. This, also, was in violation of the order of his appointment to hold the property. Having no authority to sell, it necessarily follows that he had none to pay out the proceeds of the sale, unless fairly to be inferred from instructions obtained from the court. As will hereafter appear, neither the sale of this machine, nor the use of the proceeds, was contemplated by any order made; and the receiver must be charged with its. fair value, which the record fails to show was other than. the price received.

3. Unauthorized sale and expenditure of proceeds.

III. It seems that an electric motor, which had not been paid for, was replevied; and in his report of October 15, 1896, the receiver advised the court of this, and that

**4. SAME: un- authorized expenditure: evidence.** $22.50 was due for rent; that he had no funds to pay the same; "that, since the removal of the motor aforesaid, said receiver is without power and the means to procure same, and that, for the purpose of preserving the property and continuing the business intrusted to him, it is necessary to have some power for operating the machinery; that orders for chains are coming in, and the machinery idle, and that it is necessary he be permitted to obtain funds for the purpose of carrying on the business, and caring for and protecting the machinery, property, business, and good will of the Fanning Ball-Bearing Chain Company; that a suitable and reasonable amount for the uses and purposes stated would be $300." He prayed for an order authorizing him "to borrow the sum of $300 wherewith to conduct the business aforesaid, and issue a receiver's certificate therefor." The court entered the following order: "And the cause coming to be heard on the application of G. W. Fanning, receiver, to borrow $300 to pay out and to procure power to run the machinery to finish and put on the market the manufactured product of the defendant company, and the court, after hearing the motion and arguments of counsel, and the court being fully advised in the premises, doth order and direct, by and with consent of all the parties to the suit, that the receiver be authorized and empowered to borrow three hunderd dollars ($300), and issue a certificate therefor, which shall be first paid from the property, which certificate may bear interest, not exceeding 8 per cent. per annum, from date of issue until paid, and the money so borrowed, or as much thereof as may be necessary, may be used by the receiver for the purposes aforesaid."

The order entered must be construed with reference to the application, and also, as we think, to the powers already possessed. Prior thereto he was without authority to operate the plant. For this purpose he asked that an indebtedness of only $300 be incurred by the estate, and represented that this would be a suitable amount for the purposes proposed. The parties to the litigation, all of whom were before the court, had the right to infer that this would not be exceeded. They were doubtless ready to take the risk to this extent, and yet not consent to the dissipation of property by the operation of the plant at an enormous expense and with little profit. Under the order, two purposes were to be subserved: (1) Power procured to run the machinery; and (2) the partially manufactured product of the company finished and put on the market. The money borrowed was to "be used by the receiver for the purpose aforesaid." Nowhere is he permitted to take other funds which might come into his hands, or to involve the estate in debt, in order to effect the objects mentioned. No other money could have been thought available, save possibly the proceeds to be derived from the sale of the bicycle chains when completed. To carry out the order, the receiver undoubtedly had the right to engage such assistance as might be reasonably necessary. *Lehigh Coal & Nav. Co. v. Central Railroad Co.*, 41 N. J. Eq. 167, 175, (3 Atl. Rep. 134); *Taylor v. Sweet*, 40 Mich. 736; Beach, Receivers section 275. No exception should be taken to the employment of his brother, who appears to have been possessed of special skill in making and hardening the chains. But his authority to hire was both limited in the amount to be expended and the work to be done. The broadest construction of the order possible would not justify him in plunging the estate in debt for the improvement and perfecting of the machinery, and the manufacture of new tools and of articles not theretofore produced, such as chains for cigarette machines.

Appellant says that, "during the nine months C. E. Fanning was employed, he was working at the several machines, at the different processes, and in hardening and putting chains together, and in general work all through the plant." He admits having spent a good deal of money in getting up special dies for the Winston Cigarette Machine Company. That company soon got into trouble, and comparatively few of the heavy chains were sold to it. He testified that: " * * * The light chains had been furnished to them before, and did not prove satisfactory. We had to change the method of manufacture in order to manufacture a heavy chain. All new dies had to be made to make them, and new tools had to be made. The old chain that we have constructed could not be used. A new chain had to be made, heavier. I bought some heavy steel. * * * There were other avenues of business which I thought I might open up, and I thought I might make a chain to be used for running small machines. The bicycle business had gone to pieces, and I was endeavoring to put it over on some more substantial basis. I was figuring on putting it on light machinery, and I was trying to get it in shape so that it could be used on automobiles."

The most liberal interpretation of the order could not justify the receiver in thinking the court's design was to set him up in business, and allow the use of the property of litigants in carrying on his experiments. What he did in that respect must be treated as done on his own account, for which the estate is in no way responsible. A small amount was realized from the sale of the heavy chains, but the record fails to show how much, and for this reason we are unable to make a proper credit for the item. It does not appear that more than $300 was necessarily used in finishing the chains as contemplated, and paying one month's rent, and only this sum should be allowed for that purpose.

IV.    A statement of the receipt for goods sold and
his expenses incurred for the eight months beginning
November 10, 1896, may throw some light
upon appellants peculiar notions of con-
ducting business for the court:

5. SAME: evi-
dence; mis-
management;
insufficient
excuses.

| First | month's receipts | $ 24 | 77 | expenses | $120 | 76 |
|---|---|---|---|---|---|---|
| Second | " " | 30 | 63 | " | 178 | 32 |
| Third | " " | 105 | 91 | " | 142 | 29 |
| Fourth | " " | 35 | 63 | " | 223 | 97 |
| Fifth | " " | 44 | 93 | " | 143 | 94 |
| Sixth | " " | 168 | 48 | " | 206 | 43 |
| Seventh | " " | 59 | 71 | " | 133 | 83 |
| Eighth | " " | 41 | 89 | " | 112 | 14 |

This computation is on the basis of paying C. E. Fan-
ning $100 per month for his work, and includes nothing for
the rent of $22.50 per month, nor for the services of the
receiver, who claims to have devoted all of his time to the
business, and that it was worth $100 per month.    These
items are included in the report, and the receiver modestly
asks the approval by this court of his management of a
business so conducted as that the gross receipts during
eight months were $511.35, and his expenses $2,241.68.
Thereafter he received for goods put on the market $174.80
and paid in expenses $112.27.    The figures given, though
possibly not entirely accurate, are substantially so.

Excuse or justification is attempted in several ways:
(a) He testified that he could not discharge his brother
until he had enough money to pay him.    But he knew
when the amount he was authorized to expend was ex-
hausted.    One working from such an office takes his
chances of being paid when money is available    The ex-
cuse is frivolous.  (b) Again, and with no little elation, he
points out that, while the company previous to his ap-
pointment operated the plant at a loss of $650 a month,
he had managed to sacrifice but little over $200 of the liti-
gant's property during each like period.    Even this finan-
cial feat does not appeal strongly to men accustomed to

think the object of business enterprise to be gain.     (c) He claims to have had a prospect of disposing of the patents owned by the company in England, and that, if the plant were not kept in operation, that fact would be ascertained, and a sale defeated.     The company had been in correspondence concerning this matter before his appointment, and he received a few letters thereafter.     These were from agents inquiring about the patents, and assuring him all possible was being done to effect a sale.     But he received no offers, and but one inquiry whether he would accept a stated sum.     There was nothing in the situation calculated to excite confidence in the probability of a sale, nor to indicate that, if likely, stopping the plant would affect it.     Even if both were probable, however, he was not authorized to operate the plant for any such purpose, and the objects suggested furnished no justification for so doing.     (d) It is said that he talked with the successive judges of the superior court concerning the receivership.     He so testified, and that one of them directed him to advise with the judge, rather than his attorneys, which the court had authorized him to employ.     That particular judge has departed this life, and probably this accounts for the testimony being undisputed.     Reliance is not put on any definite order.     The general statement that he talked or consulted with the judges seems to have been thought enough.     Our curiosity to learn the particular virtue of having conversed with such an officer has not been satisfied by any explanation in the record.

The statute places the receiver under the direction of the court or judge.     Sections 3823, 3824, Code.     The instructions or orders are at all times to be in writing and entered of record.     See sections 3784, 3846, Code; *Bank v. Judd*, 116 Iowa, 26.     As there is no pretense that any order was made, save in writing, or that the judges had any knowledge that the property was being dissipated by the receiver in the pretended operation of the plant, this

evidence has no bearing on the case. (e) Appellant has much to say of the fact that Audrus' lease of the building had a long period to run. We do not understand what. bearing this should have, save in moving the court in entering orders. Certainly it furnished no excuse for the receiver, as property might better be subjected to the lien. for rent than squandered. (f) It is argued that several of those interested knew something of what the receiver was doing. If so, they did nothing to indicate acquiescence therein. The details were not understood, and no one is shown to have had knowledge. that he was operating the plant otherwise than as directed. The authorities agree that very little discretion is allowed a receiver in the matter of expenses, and generally he is not to be credited with. payments of those incurred without leave of the court.. Beach, Receivers section 750; *Patrick v. Eells* (Kan.) 2 Pac. Rep. 116; *In re Sheets Lumber Co.* La. (27 So. Rep. 809); *Cowdrey v. Railroad Co.*, 93 U. S. 352 (23 L. Ed. 950).

It is not to be understood that the receiver must go. to the court with every trifling matter. Modern practice permits them to exercise their sound discretion in many matters relating to the care and management. **6.** **SAME: exercise of discretion; approval of acts.** of property in their custody, subject to the subsequent approval of the court, which will. be given when the officer has acted in good faith, and. what he has done appears to have been beneficial to the parties interested. Beach, Receivers section 269. See *U. S. v. Late Corporation of Church of Jesus Christ of Latter Day Saints*, (Utah) 21 Pac. Rep. 506; *Railroad Co. v. Herndon*, (Tex. Civ. App.) 33 S. W. Rep. 377; *Henry v. Henry*, (Ala.) 15 South. Rep. 916. But this is done at their own risk. In so important a matter as the operation of a manufacturing plant, an order should be first obtained, and the receiver keep strictly within its limits. Here, as. we have seen, he disregarded the terms of the order, and, in incurring the large indebtedness, acted entirely outside.

of the authority conferred. But even were we to construe the order as permitting discretion in the matter of expenses, we should have no hesitation in declaring that the continuance of the business under the circumstances disclosed was in disregard of his duty to preserve the estate. Not that such officers must always reap profits when conducting the business of insolvents. They may often be justified in operating at a loss. But when it becomes apparent that the business cannot be continued save at the expense of the estate, and no ulterior benefit is reasonably to be anticipated, the officer, in the exercise of reasonable prudence in the care of the property intrusted to his keeping, must stop, and proceed no further without specific directions.

V. The company owed the receiver $16.75, and immediately after his appointment as such he paid himself this amount. This cannot be allowed. He gained no 7. PAYMENT of advantage as a creditor by such appointment, claim without order. and his claim stands on precisely the same disallowance of same. footing as those of other creditors. Moreover, the distribution of the assets of the estate was entirely unauthorized. As the claims bid in by him in his wife's name are still on hand, and ready for delivery to the city marshal in pursuance of the court's order, there is no occasion for discussing the impropriety of the transaction. But see *In re Sheets Lumber Co.*, 27 South. Rep. 809; (High, Receivers (3d Ed.) sections 193, 914.

VI. The receiver was appointed October 8, 1896, and made no report of his doings until January 24, 1898, in response to a citation. In the meantime he kept the prop- 8. EVIDENCE of misman- erty in Andrus' building, where it was when agement; ad- he took possession, about a year, at a rental justment of accounts. of $22.50 per month. He then removed it into a room immediately back of his cigar store, for which he has made a charge of $10 per month for eight months, and still later to his barn, claiming $3 per month for that,

—in all, nineteen and one-half months.   The reason for retaining it for so long a time does not appear.  He knew the bicycle business had broken. · He knew that scarcely enough goods were being sold to pay the rent, insurance, express, and postage.   He says that, even to accomplish this, he gave eight hours a day to the business during the first ten months, and an average of more than four hours a day for the four or five months following, though little time thereafter.   Let him state what he did:·  "There were many nights I was working on the correspondence after twelve o'clock.   There was a great deal of correspondence pertaining to the business, and the books, also, had to be kept."   He also kept posted on the markets. Three hundred and eighty-six entries were necessarily made on his books during the ten months, and five hundred and seventeen all together.   The bare statements are enough either to throw doubt on his veracity, or else to demonstrate his folly.  Thereafter but $120.45 was received for goods, and his notion is that he should be paid $50 for rent while selling them, and $250 for his services.   Just why he removed the property to his own premises, instead of procuring an order for its sale and selling it, is not clear. He testified the judge of the superior court thought the change advisable, but makes no claim that said judge was informed of the condition of the estate, or that it was being managed in a way to consume it with expenses. Moreover, the statute forbids a judge of a court of record from practicing as an attorney at law, or giving advice as such "in relation to any action pending or about to be brought in any of the courts of the state."   Section 281, Code.   His functions are not advisory, but to direct and command.   Street talk, if indulged in, is of no more consequence than that of any other lawyer.  A judge's orders or instructions, to be of any protection, save possibly as bearing on motive, must be reduced to writing and entered of record as required by statute.   It should be added that

the record fails to show that the receiver was misled in the least by any of the alleged talks with the several judges who occupied the bench of the superior court during his incumbency.

At the time of the removal he had on hand the press which was sold November 9, 1897, the chain tester sold December 24th, and the drilling machine sold January 20, 1898. Thereafter he disposed of other property to the amount of $92.58. According to his estimate, the property remaining on hand was not worth to exceed $135.25. Why should this property be retained, rent paid for its storage, and $50 per month paid the receiver during eight months, and $25 per month thereafter, for guarding it? He had represented that the property would be protected by carrying on the business. Instead it was being destroyed, and he knew it, but remained silent. No one interested was informed of the situation, and not until compelled did he advise the court of what had been done. When he discovered that the business could not be carried on without loss, and that the sales, in the manner made, did not amount to enough to meet expenses, it was his plain duty to so advise the court. No prudent man would hold property, knowing it was surely being eaten up by expenses. No trustee can be permitted to do so without the express order of the court, after being fully advised. It is evident that the receiver's accounts cannot be adjusted on the basis proposed in his reports. To do so would be unfair to the litigants, and involve the approval of conduct oblivious to his duty as an officer of the court, and utterly at variance with ordinary notions of business prudence. The best that can be done is to deal with the results in accordance with the ordinary rule where receivers act without authority, and make allowance according to the benefits received.

VII. The appellant has received on accounts and for property sold, $1,967.61. Of this he was authorized to use

$300 in paying a month's rent, of $22.50, and finishing un-

9. ATTORNEY'S completed materials. He should also be al-
fees. lowed interest on this item, of $19.27. Besides
the above, he has paid Andrus two month's additional rent,
or $45. Deducting these credits, there remains $1,579.84.
$44.42 were expended for insurance. A loss occurred, and
$132 was collected. This is claimed to have been expended
in repairing the property injured, but without the direc-
tion of the court. Such expense is not shown to have been
of any benefit to the estate. Some of the receipts must
have been from sales of the heavy chains. The court
ordered the receiver to pay into the clerk's hands $1,000,
and $30 for the attorney who defended him. The miscon-
duct of the receiver occasioned that expense, and its pay-
ment by him cannot be complained of. Was the difference
between this $1,000 and the $1,579.84, less receipts for
heavy chains, together with the balance of insurance
money, reasonable compensation for all the expenses in
the care and sale of the property? Ordinarily it should
have been much less, but in view of many sales in small
quantities, and the circumstances disclosed, we are inclined
to approve the order made by the superior court.—AFFIRMED.